IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT

STATE OF ALASKA,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )
                                    )
THOMAS LEICHTY,                     )
                                    )
            Defendant.              )    No. 3ANS-03-7048 CR
_____)
                                    )
STATE OF ALASKA,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )
                                    )
PATRICK SHORTY,                     )
                                    )
            Defendant.              )    No. 3ANS-03-7796 CR
_____)


VOLUME I

TRANSCRIPT OF PROCEEDINGS

April 16, 2004 - Pages 2 through 99

June 28, 2004 - Pages 100 through 150

June 29, 2004 - Pages 151 through 159


TRANSCRIPTS ONLY
1943 Hillcrest Drive
Anchorage, Alaska 99517
(907) 276-0306

Exhibit 1
Pg 1 of 17
da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

**3**

EVIDENTIARY HEARING
BEFORE THE HONORABLE MICHAEL L. WOLVERTON
Superior Court Judge

Anchorage, Alaska
April 16, 2004
8:57 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF:    DEPARTMENT OF LAW
    DISTRICT ATTORNEY'S OFFICE
    BY:  ERIN E. WHITE, ESQ.
        ASSISTANT DISTRICT ATTORNEY
    310 K Street, Suite 520
    Anchorage, Alaska 99501
FOR THE DEFENDANT    JOHN M. MURTAGH, ESQ.
THOMAS LEICHTY:    1101 West Seventh Avenue
    Anchorage, Alaska 99501
FOR THE DEFENDANT    LAW OFFICE OF ROBIN KOUTCHAK
PATRICK SHORTY:    BY: ROBIN L. KOUTCHAK, ESQ.
    814 West Second Avenue
    Anchorage, Alaska 99501

TRANSCRIPTS ONLY
(907) 276-0306          3

---

**4**

1          P R O C E E D I N G S
2    3AN-5304-076
3    8:57:10
4          THE COURT:  Be seated.  Good morning.  We're here on
5    record for motion hearings in two cases, 3ANS-03-7048, State of
6    Alaska v. Thomas Leichty.  He's here with counsel, Mr. Murtagh,
7    3ANS-03-7796, Patrick Shorty, who's here with counsel.
8    Ms. White's here for the State.  Are the parties ready to
9    proceed this morning?
10         MS. WHITE:  Yes, Your Honor.
11         MS. KOUTCHAK: Yes, Your Honor.
12         THE COURT:  We ready to call witnesses?
13         MR. MURTAGH:  Yes, Your Honor.  I was going to say the
14   severance motion is a nonwitness motion, and I'll have some
15   comments on how we should proceed, but it's probably good to
16   take advantage of the time we -- with witnesses.
17         THE COURT:  Okay, thank you.  And you may call the first
18   witness.
19         MS. WHITE:  Thank you, Your Honor.  The State will call
20   Officer Cottle.
21         THE COURT:  Okay.  If you could come forward to the
22   witness stand to be sworn by Madam Clerk, please?
23         THE CLERK:  Raise your right hand, please.
24         (Oath administered)
25         OFFICER COTTLE:  I do.

---

**5**

1          THE CLERK:  Please be seated.
2                 OFFICER ANDY COTTLE
3    called as a witness on behalf of the plaintiff, testified as
4    follows on:
5                 DIRECT EXAMINATION
6          THE CLERK:  And for the record, would you please state
7    your full name, spelling your last?
8    **A    Andy Cottle, C-o-t-t-l-e.**
9          THE CLERK:  Thank you.
10         THE COURT:  You may inquire.
11         MS. WHITE:  Thank you, Your Honor.
12   BY MS. WHITE:
13   Q    Good morning, Officer Cottle.
14   **A    Good morning.**
15   Q    Where do -- how long have you worked for APD?
16   **A    I've been employed at APD since August of 1998.**
17   Q    And what is your current assignment?
18   **A    I'm assigned to patrol, currently working swing shift.**
19   Q    Is that the same assignment that you had in July of last
20        year?
21   **A    That's correct.**
22   Q    Okay, and on July 26th of last year did you have occasion
23        to come into contact with the defendant Patrick Shorty?
24   **A    I did.**
25   Q    And do you recognize Mr. Shorty in the courtroom today?

---

**6**

1    **A    I do.**
2    Q    And where is Mr. Shorty seated?
3    **A    Mr. Shorty is the gentleman in the yellow.**
4          MS. WHITE:  Your Honor, may the record reflect that the
5    witness has pointed to Mr. Shorty?
6          THE COURT:  The record will so reflect.
7    Q    And how did you happen to come into contact with the
8         defendant Patrick Shorty?
9    **A    On that day I was working in the central area, which is my**
10        **normal assignment.  I was dispatched to an address of 1004**
11        **Ingra Street with Officer Witte to contact a possible**
12        **sexual assault subject that was in fact Patrick Shorty and**
13        **was identified as being such in the -- in the dispatch.**
14   Q    Okay, and how was it that you identified Patrick Shorty as
15        a possible sexual assault suspect?
16   **A    That information had been widely circulated through the**
17        **department in terms of a locate for patrol officers to be**
18        **looking for that individual.  I was slightly aware of the**
19        **original investigation, but it had taken place on my**
20        **regular days off and so didn't have a real intricate**
21        **knowledge of it.**
22   Q    Okay, and what happened when you first saw the defendant?
23   **A    Officer Witte contacted him prior to my arrival.  I was**
24        **aware of that just by listening to the radio traffic, and**
25        **I parked at a music repair instrument store that --**

---

3 (Pages 3 to 6)

Exhibit 1
Pg 2 of 17

da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY                                    EVIDENTIARY HEARING
CASE NO. 3AN-03-7796 CR                  APRIL 16, JUNE 28 & JUNE 29, 2004

---

**7**

1  located on the same side of Ingra, just slightly north of
2  it, and walked the rest of the distance on foot to where
3  Officer Witte was already contacting the suspect.
4  Q   And what was transpiring between Officer Witte and the
5      defendant when you arrived on the scene?
6  A   Officer Witte was attempting to identify the subject using
7      information that he had been provided by the subject.
8  Q   Okay, and was the subject identified as Patrick Shorty?
9  A   Not at that time.  He -- he'd given me information
10     that -- and, again, I'm -- I'm referring to my report --
11     which had included the name of Gregory, along with some
12     other personal identifiers, and was not having any luck at
13     that time identifying the individual that the suspect was
14     stating that he was.
15 Q   And was he ultimately identified as Patrick Shorty?
16 A   Was he ultimately?
17 Q   Yes.
18 A   Yes.
19 Q   And how did that happen?
20 A   Well, that was -- that was subsequent to his -- to his
21     arrest.
22 Q   Okay, and why was he arrested?
23 A   He was arrested for resisting an assault in terms of our
24     arrest.  The contact was for that he was in fact in by
25     name as being the suspect Patrick Shorty and we responded

---

**8**

1  to that area.  I asked Officer Witte upon my arrival at
2  the scene what he was able to do, if he was having any --
3  any success in locating the individual that the suspect
4  was stating that he was, and he told me he wasn't.  I
5  asked Mr. Shorty if he had anything on him with his name,
6  told him that most adults are able at least to remember
7  their birth dates, even if they couldn't remember their
8  social security number, 'cause he was stating at that time
9  he couldn't.  The suspect stated that he didn't have
10 anything on him that matched my request, but he allowed
11 Officer Witte to look for ID in his pack, and then he
12 attempted to hand me his coat, which I refused.
13 Q   Uh-huh.  And what happened as you and Officer Witte were
14     trying to arrest the defendant?
15 A   Officer Witte told him that he was going to be detained,
16     and he attempted to secure his right arm, and I began to
17     place my left hands on the suspect's left arm.  He
18     immediately began to pull away very violently.  Officer
19     Witte and I went to the ground with him.  We both yelled
20     at him multiple times to stop resisting, and at
21     approximately 5:33 p.m. I requested officers respond code
22     to our location.
23 Q   And what does that mean, a request for officers respond
24     code?
25 A   That means I needed officers with lights and sirens to get

---

**9**

1  there as fast as humanly possible.
2  Q   And what did you do while you were waiting for other
3      officers to arrive?
4  A   As we fell to the ground it just happened that I was near
5      the top of Mr. Shorty's head and I attempted to cr--
6      control him and control his head, as Officer Witte
7      attempted to control his hands.  He continued to struggle
8      very violently, turning and pulling his body away, and he
9      was actually starting to pull away from Officer Witte and
10     I, as well as being able to stand up.  At that time I
11     continued to yell at him to stop resisting, and I applied
12     a vascular restraint.
13 Q   What is a vascular restraint?
14 A   Vascular restraint is using the bicep/deltoid area of one
15     side of your arm and the wrist and forearm of your other
16     side of your arm and applying pressure to both sides of a
17     suspect's neck to gain their compliance.
18 Q   And what happened as you were applying the vascular
19     restraint?
20 A   He continued to resist.  I continued to apply the vascular
21     restraint.  There's -- there's three -- there's three
22     levels.  You basically have rear neck lock of a vascular
23     restraint and you have compliance at that point, just
24     verbal compliance.  You have mechanical compressions if
25     they don't comply until you have conscious compliance, and

---

**10**

1  a third stage is that you continue complying until you
2  have unconscious compliance.  I can -- I was not getting
3  compliance.  I continued to apply the vascular restraint.
4  I eventually felt him go slightly limp and heard Officer
5  Witte advise me that he was out.
6  Q   And.....
7  A   At that point I left my arms in place, but I ceased
8      complying mechanical compressions.
9  Q   And what happened after you ceased the compressions?
10 A   I -- within several seconds I felt the tension in the
11     defendant's body increase and he began to struggle
12     violently again.  At that time I yelled at him again to
13     stop resisting.  Officer Witte had only been able to grab
14     the defendant's right arm, and his left arm was still
15     under him free.  As he continued to fight more, and again
16     I became fearful that he was actually going to be able to
17     beat Officer Witte and I, basically, he was going to be
18     able to struggle, get free and -- and get off the ground,
19     I delivered several knee strikes to his midsection while I
20     continued to yell at him to stop resisting.
21 Q   Okay, and what happened to you personally during the
22     struggle?
23 A   My right knee, my uniform was tore open and I had about a
24     half-dollar-size chunk of flesh basically tore out, which
25     required to go to the emergency room.  Took several weeks

---

4 (Pages 7 to 10)

Exhibit 1
Pg 3 of 17
da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

11

1   to heal, probably along the lines of about six weeks.
2   That was after, of course, we -- several other officers,
3   again, we -- multiple, multiple officers were -- were en
4   route. Officer Ritala was the first to arrive. I placed
5   the defendant in -- in a thigh lock as Officer Ritala
6   arrived and continued to yell at him to stop resisting and
7   that he was under arrest. We were able to secure him upon
8   officer -- another officer's arrival, Officer Witte as
9   well as -- Ritala, as well as other officers, and we
10  placed him into custody. At that time I had no further
11  contact with the defendant, and went to the emergency
12  room.
13 Q   And how was the defendant ultimately restrained?
14 A   He was handcuffed.
15 Q   Okay. And in your opinion was it necessary to use force
16  in arresting him?
17 A   Oh, there's -- there's no doubt.
18      MS. WHITE: Okay, thank you. I have no further questions.
19      THE COURT: Cross-examination.
20          OFFICER ANDY COTTLE
21  testified as follows on:
22          CROSS-EXAMINATION
23 BY MS. KOUTCHAK:
24 Q   Officer Cottle, I know that you've been looking down. You
25  must be reading off a report up there?

12

1 A   Yes, as I indicated. Yes, ma'am.
2      MS. KOUTCHAK: Okay. I'd like to take a look at that.
3      MS. WHITE: Okay.
4      MS. KOUTCHAK: I just want to see what he's got. May I
5  approach?
6 Q   Going to show you some pictures, and I want you to
7  identify who they are. Is that you? Is that your knee?
8 A   I can't see my face, but that would appear to be -- that
9  would be -- appear to be me, yes, ma'am.
10 Q   Okay. Do you know who took these pictures?
11 A   I don't recall.
12 Q   Okay. Was this -- does this appear to be the incident
13  that you're talking about to the Court of the struggle
14  with Patrick Shorty? Is this it?
15 A   Yes, ma'am.
16      MS. KOUTCHAK: Okay. I'd move for admission of these
17  exhibits.
18      MS. WHITE: No objection.
19      MS. KOUTCHAK: We'll call these defense exhibits what, 1
20  or 2 or.....
21      THE COURT: A and B.
22      MS. KOUTCHAK: A and B?
23          (Defendant Shorty's Exhibits A and
24              B admitted)
25      MS. KOUTCHAK: Your Honor, would you like to see these?

13

1      THE COURT: Sure.
2 Q   So that's the injury that you went to the emergency room
3  for?
4 A   Yes, ma'am.
5 Q   You skinned your knee.
6 A   No.
7 Q   Basically, you skinned your knee.
8 A   No.
9 Q   Look at the pictures.
10      THE COURT: That's argumentative. I can see the picture.
11  I'll make a determination.
12      MS. KOUTCHAK: Okay.
13      THE COURT: You may proceed.
14 Q   Did you have stitches or anything?
15 A   No, ma'am.
16 Q   They put iodine on it?
17 A   They did dress it with something. Whether it was
18  specifically iodine, I don't recall.
19 Q   Okay. Have you ever skinned your knee before, officer?
20 A   Skinned my knee?
21 Q   Yeah.
22 A   Yes, ma'am.
23 Q   Okay. You said that took six weeks to heal?
24 A   Approximately, yes, ma'am.
25 Q   You've been a patrolman at APD since 1998?

14

1 A   That's correct.
2 Q   Okay. What did you do before that?
3 A   I was a DEA agent, special agent of the Drug Enforcement
4  Administration for 6-1/2 years. I was a probation parole
5  officer for approximately two years. I've been in law
6  enforcement for 14 years.
7 Q   Where were you a DEA agent at?
8 A   Washington State, as well in -- in Alaska.
9 Q   And did you actually work for the federal government,
10  then, or were you on contract locally?
11 A   No, I said I was special agent for the Drug
12  Enforcement.....
13 Q   Okay.
14 A   .....Administration, 1811.....
15 Q   Okay.
16 A   .....criminal investigator.
17 Q   And that was the last job you had prior to coming to APD?
18 A   That was my former employer, yes. Left one day with DEA
19  and started the next basically with APD, yes.
20 Q   Okay. Did you undergo any training down in Sitka or
21  anything for APD?
22 A   No, never.
23 Q   They took you as is from DEA?
24 A   APD doesn't train in Sitka.
25 Q   Okay. Okay, they -- that's right, they do training right

TRANSCRIPTS ONLY
(907) 276-0306

Exhibit 1
Pg 4 of 17
da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

**51**

1    place, as well as the -- the -- the degree of his
2    resistance and -- and res-- you know, violent response to
3    our contact with him. It -- when you re-- when you resist
4    the control techniques, they can, again, and that was my
5    explanation to the Court, was a hard empty-hand control
6    has the ability to cause res-- to cause injury, and the
7    greater the resistance and -- and violence of response of
8    the defendant, the greater that propensity is.
9    MS. WHITE: Thank you I have no further questions.
10   THE COURT: Anything further?
11   MS. KOUTCHAK: Yes, Your Honor, briefly.
12            OFFICER ANDY COTTLE
13   testified as follows on:
14            RECROSS-EXAMINATION
15   BY MS. KOUTCHAK:
16   Q    At what time did you go to the emergency room?
17   A    Would have been pretty much after briefing the responding
18       sergeant to what had occurred and having whoever it was
19       photograph.....
20   Q    I mean the time. What time was it?
21   A    I don't recall, and I don't see that I noted it in my.....
22   Q    Okay.
23   A    .....report, ma'am.
24   Q    What time is noted in your report that you responded to
25       this?

---

**53**

1    Q    So you have no other records of this incident besides your
2        written record.
3    A    Me personally, no, I don't.
4    Q    Right.
5    A    I -- I have my report that I wrote.
6    Q    Okay. Do you have any knowledge as to whether my client
7        went to the emergency room, too?
8    A    I have none either way. I don't know.
9    MS. KOUTCHAK: Okay. Thank you. No further.....
10   THE COURT: Thank you. You may step down.
11   A    Thank you, Your Honor.
12   (Witness excused)
13   THE COURT: How many more witnesses do you have?
14   MS. WHITE: Your Honor, I have one, two, three, four more
15   witnesses. I have a witness who's been sitting outside, Officer
16   Torres, for about an hour and a half, and he has to do with the
17   Leichty motion to suppress and the proposal cause issue, and
18   with the Court's permission I'd like to go ahead and call him so
19   that I can release him, and I have Officer Ritala, who's also
20   going to testify to this particular motion, and Detective McCoy.
21   THE COURT: Okay, we'll take about a five-minute
22   recess.....
23   MS. WHITE: Thank you.
24   THE COURT: .....and then we'll start again.....
25   MS. WHITE: All right.

---

**52**

1    A    Give me just a second, please. Let me.....
2    Q    Okay.
3    A    The -- the first that -- that I can see here, the time
4        that I note is that -- if -- it was at -- in military time
5        1733, so 5:33 p.m. I requested officers respond code to
6        our location. So that was the first time that I noted in
7        my report.
8    Q    Okay. Did you have a radio on your that you were able to
9        call for help?
10   A    Yes, ma'am.
11   Q    Okay. So you didn't have to leave and run back to the car
12       to call for help.
13   A    No.
14   Q    Okay. This happened about 5:33 p.m., in that general
15       area. What time do you think it was based on that
16       information that you think you might have gone to the
17       emergency room?
18   A    I have no idea. To -- to just -- very generally I would
19       say it would have been approximately 30 minutes to maybe
20       45, given that it was July of last year.
21   Q    Okay. And during this entire contact with my client,
22       Officer Witte [sic], did you have a tape recorder running?
23   A    No, ma'am.
24   Q    You didn't have any contact tape running at all?
25   A    No.

---

**54**

1    THE COURT: .....with the next officer.
2    (Off record at 9:56 a.m.; on record at 10:10 a.m.)
3    THE COURT: And both Mr. Leichty and Shorty are here with
4    counsel, and you may call your next witness.
5    MS. WHITE: Thank you, Your Honor. The State calls
6    Officer Torres.
7    THE COURT: And if you could stand to be sworn by Madam
8    Clerk, please.
9    OFFICER TORRES: Sure.
10   THE CLERK: Would you raise your right hand?
11   (Oath administered)
12   OFFICER TORRES: I do.
13   THE CLERK: Please be seated.
14            OFFICER LEONARD TORRES
15   called as a witness on behalf of the plaintiff, testified as
16   follows on:
17            DIRECT EXAMINATION
18   THE CLERK: And for the record would you please state your
19   full name, spelling your last?
20   A    Leonard Torres, T-o-r-r-e-s.
21   THE CLERK: Thank you.
22   THE COURT: You may inquire.
23   MS. WHITE: Thank you, Your Honor.
24   BY MS. WHITE:
25   Q    Officer Torres, how long have you worked for APD?

---

15 (Pages 51 to 54)

Exhibit 1
Pg 5 of 17

da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

Page 55

1  A   This June it'll be four years.
2  Q   And what is your current assignment?
3  A   I'm currently assigned with the special assignment unit.
4      It's a vice unit in APD.
5  Q   And what did you do before you went to work for APD?
6  A   Before I went to work with APD?
7  Q   Right.
8  A   I was working at McLaughlin Youth Center.
9  Q   Okay, so you were a probation officer?
10 A   No, I was a youth counselor, which is basically one of the
11     custodians there that watches over the kids.
12 Q   Okay. And what kind of assignment did you have with APD
13     last July?
14 A   I was in patrol.
15 Q   Okay. And did you come into contact with defendant Thomas
16     Leichty last July?
17 A   I did.
18 Q   And when was that?
19 A   The 8th of July.
20 Q   The 8th of July? And how did that contact come about?
21 A   While doing a routine patrol I was approached by a young
22     female that was walking out of a wooded area. She ran up
23     to my vehicle crying hysterically, trying to get in. I
24     jumped out and asked her what was wrong. She told me that
25     she'd just been raped by those three men, and she pointed

---

Page 56

1      eastbound on 13th Avenue towards Cordova, and I could see
2      three males running eastbound away from my vehicle
3      on -- on Cordova -- on 13th.
4  Q   Were you able to catch up with any of those three men?
5  A   Not at that time. I was advising dispatch what was going
6      on. All the units were responding. I was starting to set
7      up a perimeter. As I was observing the -- the three men
8      running I observed that one of them turned northbound into
9      some residential area that was being built. The other two
10     turned southbound off of 13th into some apartments. I
11     continued giving directions for a perimeter setup, and I
12     observed one of the gentlemen return back to 13th Avenue,
13     continue running eastbound. At that time I had the victim
14     get in the back of my vehicle and I did make contact with
15     the person that was running.
16 Q   And who was the person who was running?
17 A   It was Thomas Lei-- Leichy [sic]? Is -- I'm sorry.
18 Q   Leichty?
19 A   Leichty.
20 Q   Is he in this courtroom today?
21 A   I assume so.
22 Q   Do you recognize him from your prior contact?
23 A   Vaguely.
24 Q   Okay, and which one do you believe him to be?
25 A   I believe he's the gentleman in -- on the left. Or,

---

Page 57

1      rather, my right. I apologize. In the dark coveralls.
2  Q   Okay. And so you were able to detain Mr. Leichty.
3  A   I was.
4  Q   Okay. And did the victim identify him as one of the three
5      men involved?
6  A   She did.
7  Q   And so she said that he was one of the three men involved
8      in this assault.
9  A   She did.
10 Q   Okay. And what else did you do after the identification
11     was made?
12 A   Once he was identified, I had him detained by that time, I
13     advised dispatch that I would need another unit to -- to
14     take custody of -- of Mr. Leichty. Once that unit arrived
15     and -- and took custody of him I transported the victim
16     down to the hospital for an exam.
17 Q   Okay, was -- did you do any investigation of the scene
18     before you transported her down?
19 A   Yes, I asked her where the -- the assault had occurred.
20     She stated that it was in a wooded area that I had just
21     driven by when I made contact with her. I took her back
22     to the scene to see if she could point out exactly where
23     it had occurred.
24 Q   And what did you find at the scene?
25 A   I myself did not find anything at the scene. Once she

---

Page 58

1      gave me the general location I gave that information to
2      the other officers there were going to work the crime
3      scene, and I took her back to the hospital.
4  Q   Okay, were any -- did anybody find any panties at the
5      scene?
6  A   Yes, once at the hospital I asked the victim if anything
7      had been behind, if she still had her underwear,
8      basically, and she stated that she didn't, that when she'd
9      been assaulted they had taken them off and that they were
10     still at the scene. I relayed that information to the
11     officers at the crime scene and I was told that they had
12     been found.
13     MS. WHITE: Thank you. I have no further questions.
14     THE COURT: Cross-examination.....
15     MR. MURTAGH: Thank you.
16     THE COURT: .....Mr. Murtagh.
17          OFFICER LEONARD TORRES
18 testified as follows on:
19          CROSS-EXAMINATION
20 BY MR. MURTAGH:
21 Q   Good morning, Officer Torres.
22 A   Good morning, sir.
23 Q   Did you discuss your testimony today with anyone from the
24     State prior to coming into the courtroom this morning?
25 A   No, sir.

---

16 (Pages 55 to 58)

Exhibit 1
Pg 6 of 17
da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

**59**

1  Q  Did they explain to you -- who told you what case you were
2     coming to court on?
3  A  Well, I got a subpoena.
4  Q  And you didn't contact anyone at all, you just showed up
5     in the hall at the appropriate moment.
6  A  The only person that I contacted with -- was Detective
7     McCoy.
8  Q  Did you.....
9  A  And that was yesterday.
10 Q  And did you discuss the testimony with Detective McCoy?
11 A  My testimony?
12 Q  Uh-huh.  Yes.
13 A  No, sir.
14 Q  Did you discuss the facts of the case with Detective
15    McCoy?
16 A  No, sir.
17 Q  And you haven't spoken one sentence with Ms. White about
18    what the testimony or questions she might ask you is
19    today.
20 A  No, sir, when -- when I arrived she was already inside.
21 Q  Okay.  Fair enough.  And we don't need to use the young
22    lady's name, but I'll at least use her initials so we have
23    a complete record.  If I say that the young lady you
24    contacted or who contacted you was B.A., does that ring a
25    bell so we're talking.....

---

**60**

1  A  Yes, sir.
2  Q  .....about the same person?
3  A  Yes, sir.
4  Q  And do you remember what time it was that you contacted
5     her?  And feel free to look at your report.
6  A  Well, according to my report it was 8:50 in the evening.
7  Q  8:50 p.m.  And she initiated the contact with you?
8  A  Well, it was almost a -- a joint effort.  I had -- I had
9     observed her when she was walking fr-- in from the wooded
10    area.  She just didn't look right.  She was disheveled and
11    just had a lot of grass and dirt on her, and I stopped and
12    waited, and at that point we made eye contact, and then
13    she came running directly to me.
14 Q  When was it that she looked in the mirror of a vehicle she
15    walked by?
16 A  She was -- she was looking in the mirror of an RV just as
17    she had kind of come up over the hill.
18 Q  Okay.  What happens is we all kind of take it as second
19    nature that we know where we're talking about when we say
20    13th and Cordova, but let's try to be -- I'll try to be
21    precise.  I know you'll be precise.  You were driving a
22    patrol vehicle, correct?
23 A  I was, sir.
24 Q  And you were driving which direction in which road?
25 A  I was driving eastbound on 13th Avenue off of A Street.

---

**61**

1  Q  And so that's towards the mountains?
2  A  Yes, sir.
3  Q  West of Cordova?
4  A  Yes.
5  Q  Okay.  And you first saw her at what general area?
6  A  She was in a wooded area that's right there on 13th
7     between A and Cordova.
8  Q  And -- well, 13th runs one way and Cordova runs another
9     and A runs another.  Which way -- which side, south or
10    north of 13th is the wooded area?
11 A  South.
12 Q  Is it correct that 15th and Cordova is like the hill down
13    to the Sullivan, and then there's the church at the
14    northeast cor-- northwest corner?
15 A  Of what street are we talking about?
16 Q  Of 15th and Cordova.  I'm trying to work off 15th and
17    Cordova, which is a more familiar place.
18 A  There is a church there.  I don't know if it's on 14th or
19    if it's on 15th.
20 Q  Okay.  And the construction area that you were talking
21    about, again, I think we all know there are a number of
22    like townhousing things being built next to each other,
23    but is that on one of the numbered streets or did that
24    develop or get his or her own street?
25 A  It's -- it's right on 13th Avenue.  I don't know if

---

**62**

1     it's -- it has to be according to 13th because.....
2  Q  Okay.
3  A  .....it's right on 13th.
4  Q  And is that wooded area then south of 13th, like across
5     from that construction area by 13th, sort of that neck of
6     the woods?
7  A  The wooded area is south of 13th Avenue, but it's not
8     directly across from the residential area and all.....
9  Q  It's farther west.....
10 A  .....the new houses.
11 Q  .....than that?
12 A  Yeah.....
13 Q  Closer to A.
14 A  .....it's farther west.
15 Q  Okay.  And when you first saw her, you've described that,
16    did you first speak to her or did she first speak to you?
17 A  No, she came running up to my car crying hysterically
18    asking to get into my car, so I -- she spoke to me first.
19 Q  And is it correct that you then got out of the car
20    because -- are your doors normally locked; is that.....
21 A  As she was running towards.....
22 Q  .....patrol police?
23 A  .....me crying hysterically I was already getting out of
24    my vehicle.
25 Q  Okay.  So you're parked on 13th, your vehicle facing east

---

TRANSCRIPTS ONLY
(907) 276-0306

Exhibit 1
Pg 7 of 17

da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY                                    EVIDENTIARY HEARING
CASE NO. 3AN-03-7796 CR                    APRIL 16, JUNE 28 & JUNE 29, 2004

---

**99**

1  Q    So a tape recorder is not your primary concern at
2       that.....
3  A    **Not at that time, no.**
4       MS. WHITE:  Thank you.  I have no further questions.
5       THE COURT:  Anything further?
6       MS. KOUTCHAK:  Nothing, Your Honor.
7       THE COURT:  You may step down.
8  A    **Thank you, Judge.**
9       **(Witness excused)**
10      THE COURT:  We'll stand in recess briefly while we take up
11 the status hearing in the Lyons (ph) case.  We'll go off record.
12      (Off record at 11:03 a.m.)
13 11:03:08
14 /
15 /
16 /
17 /
18 /
19 /
20 /
21 /
22 /
23 /
24 /
25 /

---

**101**

1       P R O C E E D I N G S
2  3AN-5304-131
3  3:09:56
4       THE COURT:  This is the time set for a continued
5  proceedings and motion hearings in cases 3ANS-03-7048, State of
6  Alaska v. Thomas Leichty, who's here with his attorney,
7  Mr. Murtagh -- or Mr. Murtagh, and we have 3ANS-03-7796, Patrick
8  Shorty here with counsel, Ms. Koutchak.  We have Ms. White for
9  the State.  Are we ready to proceed with further witness
10 testimony?
11      MS. WHITE:  Yes, Your Honor.
12      THE COURT:  You may call the next witness.
13      MS. WHITE:  Your Honor, the State calls Officer Witte.
14      THE COURT:  All right.  I want to apologize for the delay
15 this afternoon.  I made the foolish mistake of thinking I could
16 drive around town at noon in Anchorage.
17      MS. WHITE:  Not in the summertime.
18      THE COURT:  Well, it was -- it can only be described as
19 hideous.
20      (Oath administered)
21 I do.
22      THE CLERK:  Please be seated.
23      OFFICER GREGORY WITTE
24 called as a witness on behalf of the plaintiff, testified as
25 follows on:

---

**100**

EVIDENTIARY HEARING, CONTINUED
BEFORE THE HONORABLE MICHAEL L. WOLVERTON
Superior Court Judge

Anchorage, Alaska
June 28, 2004
3:09 o'clock p.m.

APPEARANCES:

FOR THE PLAINTIFF:    DEPARTMENT OF LAW
                     DISTRICT ATTORNEY'S OFFICE
                     BY:  ERIN E. WHITE, ESQ.
                     ASSISTANT DISTRICT ATTORNEY
                     316 K Street, Suite 520
                     Anchorage, Alaska 99501
FOR THE DEFENDANT    JOHN M. MURTAGH, ESQ.
THOMAS LEICHTY:      1101 West Seventh Avenue
                     Anchorage, Alaska 99501
FOR THE DEFENDANT    LAW OFFICE OF ROBIN KOUTCHAK
PATRICK SHORTY:      BY:  ROBIN L. KOUTCHAK, ESQ.
                     814 West Second Avenue
                     Anchorage, Alaska 99501

TRANSCRIPTS ONLY
(907) 276-0306          100

---

**102**

1       DIRECT EXAMINATION
2       THE CLERK:  And for the record, please state your full
3  name, spelling your last.
4  A    **Gregory Tye Witte, W-i-t-t-e.**
5       THE CLERK:  Thank you.
6       THE COURT:  You may inquire.
7       MS. WHITE:  Thank you, Your Honor.
8  BY MS. WHITE:
9  Q    Officer Witte, how long have you worked for APD?
10 A    **Four years.**
11 Q    And what is your current assignment?
12 A    **I'm assigned to patrol.**
13 Q    And is that the same assignment that you had on July 26th
14      of last year?
15 A    **It is.**
16 Q    And on that day did you come into contact with the
17      defendant Patrick Shorty?
18 A    **I did.**
19 Q    And how did that happen?
20 A    **We received a dispatch from the APD dispatch center**
21      **advising that some witnesses had identified or -- Patrick**
22      **Shorty and.....**
23 Q    And.....
24 A    **.....knew that he was a suspect from a rape.**
25 Q    Okay, and where did you go to find him?

---

27 (Pages 99 to 102)
**Exhibit 1**
Pg 8 of 17

da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

103

1  A   At the 10th Avenue of Ingra.

2  Q   And what did you see when you got there?

3  A   The dispatch was for a Native male wearing a backpack and

4      a long green trench coat, and when I arrived on scene I

5      saw a Native male wearing a backpack and a long green

6      trench coat standing on the west side of the road.

7  Q   Was he with other people?

8  A   He was with several other people. He was talking to them.

9  Q   And what happened as your car pulled up to this area?

10 A   When I pulled up the small gathering of people began to

11     disperse. The person wearing the trench coat who ended up

12     being Mr. Shorty was walking -- turned and started walking

13     northbound on Ingra as I arrived.

14 Q   Okay, is Mr. Shorty in the courtroom today?

15 A   He is.

16 Q   And where is he seated?

17 A   He's seated on the right over there wearing the yellow.

18 Q   Okay. And what happened when you went up to talk to

19     Mr. Shorty?

20 A   When I got out of my car I told him to stop and turn

21     around and come back, I wanted to talk to him, and he did.

22     He turned around and came back.

23 Q   And what did you ask him when you started talking to him?

24 A   I asked for his name and his date of birth.

25 Q   And what name did he give you?

---

104

1  A   He told me his name was Harold Gregory and gave me a date

2      of birth in July. I think the year he gave me was 1969,

3      and then quickly changed it to another year.

4  Q   Okay. Did he tell you how old he was?

5  A   I think he told me was 34.

6  Q   Okay, and did you have any problems believing the

7      information about his name or his date of birth?

8  A   When someone doesn't know their exact year then I tend not

9      to believe him, so I followed up by asking several other

10     questions, one of them being your social security number,

11     and he didn't know that.

12 Q   Okay. And what did you do after talking to Mr. Shorty?

13 A   I asked him if he had some identification. He said he had

14     it in his backpack. I asked him if I could look through

15     his backpack. He said sure. He took his backpack off. I

16     placed it on the hood of my patrol car, began to look

17     through it. Officer Cottle was also there, at which point

18     I asked him another follow-up question, how old he was,

19     something to that effect, and he stated -- or when his

20     birthday was, and he said, oh, it's next month. Well,

21     didn't you just tell me it was in July and it is July, and

22     he didn't say anything. He started taking his jacket off

23     and tried to hand it to Officer Cottle at that point, and

24     Officer Cottle refused to take his jacket.

25 Q   Okay. And did you make a decision to arrest Mr. Shorty?

---

105

1  A   I did.

2  Q   And why did -- why was that decision made?

3  A   Based on the fact that we had people calling in saying

4      that it was him.

5  Q   Uh-huh.

6  A   We had been looking for him for just about a month. We

7      decided better safe than sorry and he's not -- nothing's

8      coming back to what he's telling me, his name and all that

9      kind of stuff, that, you know, at the very least we need

10     to put him in handcuffs and detain him.

11 Q   And how did the defendant respond when you started to

12     arrest him?

13 A   When I put my hands on his wrist, his right wrist, he

14     immediately pulled hard away pretty violent, and we were

15     hanging on and Officer Cottle had ahold of him as well,

16     and we got dragged probably seven to 10 feet in the alley

17     by Mr. Shorty.

18 Q   Okay. How would you describe his demeanor?

19 A   He was trying to get away from the cops. I mean, he

20     was -- he was -- it was a fight.

21 Q   Okay, and what did Officer Cottle do? What did you see

22     him do while this was going on?

23 A   We took him to the ground, forced him to the ground. He

24     was able to get his knees up underneath him and he was --

25     he was fighting, pulling hard, struggling, screaming. He

---

106

1      was, you know, resisting so much we had to up our level of

2      control that we were going for, simply because we didn't

3      want to get hurt and we didn't want him to hurt us. So

4      Officer Cottle applied the vascular restraint.

5  Q   And can you describe what the vascular restraint is?

6  A   It's -- some people would call it a choke hold. That's

7      not exactly accurate, but it's like the regular headlock

8      that you see somebody get put in, only elbow is in the

9      center of their chest or facing the center of their chest,

10     and you use mechanical compression to cut off the blood --

11     blood flow to their brain.

12 Q   And how did the defendant respond to this?

13 A   At first it didn't take. It was -- it was a real -- it

14     was a fight and we were struggling with him. Finally it

15     took, and he lost consciousness.

16 Q   And how long was he out?

17 A   It may have been five, maybe six seconds.

18 Q   Okay. And what happened while he was out?

19 A   He defecated himself, which.....

20 Q   And.....

21 A   .....is not a rare occurrence when you get -- go

22     unconscious from this maneuver.

23 Q   Okay. And what did you do with the defendant while he was

24     out?

25 A   I got a handcuff on his right arm, and then attempted to

---

28 (Pages 103 to 106)

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

107

1  get control of his left arm. I told Officer Cottle that
2  I'm -- I'm getting his left arm, getting his left arm, and
3  he relaxed his pressure that he had on the neck. Once I
4  got ahold of his left arm and started putting it behind
5  his back, Mr. Shorty regained consciousness and
6  immediately started fighting with us again, as if he
7  hadn't gone unconscious at all. It was the exact same
8  amount of force.
9  Q  Okay, and were you ever able to finally restrain the
10   defendant?
11 A  Finally we were. Officer Ritala arrived on scene and it
12   took three of us to finally place him into custody.
13 Q  And what happened next?
14 A  After that he was handcuffed and hobbled, photographs were
15   taken, medics were called, and the medics -- I think we
16   asked Mr. Shorty if he wanted the medics to take a look at
17   him.....
18 Q  Uh-huh.
19 A  .....and he said no, so we called off the medics. We
20   placed him in the back of my car, and then got ahold of
21   dispatch and let them know that we did indeed have him in
22   custody, and they called Detective McCoy.
23 Q  And where did you take the defendant?
24 A  From there I took him over to APD headquarters at Tudor
25   and Bragaw.

---

108

1  Q  And did you ever find an identification card in the
2    defendant's backpack?
3  A  I don't recall.
4    MS. WHITE: Okay. Thank you. I have no further
5  questions.
6    THE COURT: Cross-examination.
7    MS. KOUTCHAK: First, Your Honor, a housekeeping matter.
8  It got by us in the first hearing. We thought that there was
9  just a visitor in the courtroom or maybe someone from Victims
10 Rights, and I think there is someone here from Victims Rights,
11 but there's also, I believe, a potential witness here for.....
12   THE COURT: Who's that?
13   MS. KOUTCHAK: .....the State. I believe that she's the
14 detective that.....
15   THE COURT: She'd better not. She's my law clerk.
16   MS. KOUTCHAK: Oh.
17   THE COURT: That'd be against the rules.
18   MS. KOUTCHAK: Good. There was one here that was. She
19 was sitting right there.
20   THE COURT: Okay.
21   MS. KOUTCHAK: Good. Thanks. I apologize.
22   THE COURT: Okay. She's good for a lot of things, but
23 that wouldn't work.
24   MS. KOUTCHAK: You're not a detective for the case.
25 You're not the case detective, good.

---

109

1           OFFICER GREGORY WITTE
2  testified as follows on:
3           CROSS-EXAMINATION
4  BY MS. KOUTCHAK:
5  Q  Okay, Officer Witte, you've been four years on patrol now.
6  A  I've been -- I've been on patrol for probably 2-1/2 years.
7  Q  Okay, you're four years with the department?
8  A  Right.
9  Q  So last year at this time, three years?
10 A  Okay.
11 Q  Okay. What's your educational background?
12 A  I have a bachelor's degree in psychology.
13 Q  From where?
14 A  Wayland Baptist University in Plainview, Texas.
15 Q  What did you do before you were a police officer?
16 A  I worked at Alaska Regional Hospital as an admitting
17   clerk.
18 Q  You stated that you'd gotten a dispatch that a witness had
19   ID'ed Patrick Shorty. Had you been on the lookout for
20   Patrick Shorty prior to this?
21 A  Yes.
22 Q  And why was that?
23 A  Because he had a felony warrant out for his arrest for
24   rape.
25 Q  Okay. And then what happens usually, do you have a

---

110

1  meeting before your shift or something where you go over
2  the people that you should be on the lookout for? How
3  does that happen?
4  A  We have flyers posted stating the guys that have felony
5    warrants. For some that need special attention like we
6    really need to get off the street, then we will have
7    meetings about it. I don't recall specifically having a
8    meeting about him, but being that the crime happened in
9    the downtown area, I'm sure the downtown guys, we'd gotten
10   together and talked about it.
11 Q  Okay. And you were aware, then, at the time of what he
12   was being charged with?
13 A  I was.
14 Q  And what was that? To the best of your knowledge what was
15   your knowledge at the time of what my client was being
16   charged with and the circumstances involving the
17   allegations?
18 A  Sexual assault in the first degree. We'd been told that
19   it was a violent rape.
20 Q  Against who?
21 A  Against a female.
22 Q  How old of a female?
23 A  I don't know.
24 Q  When you got to the scene you said that there was a large
25   group of people congregating. About how many people were

---

29 (Pages 107 to 110)

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

**111**

1     there?

2 **A**   **I think there may have been three or four.**

3 **Q**   Okay. You consider that to be a large group?

4 **A**   **I don't think I said large, no.**

5 **Q**   Three to four people, including my client?

6 **A**   **I believe so.**

7 **Q**   Okay. He gave you the name of Harold Gregory?

8 **A**   **Right.**

9 **Q**   And he gave you a birth date. Do you remember what that

10     birth date was that he gave you?

11 **A**   **I'd have to refresh my memory by looking at my report, but**

12     **I remember it was in July of -- I think the year he told**

13     **me was 1969.**

14 **Q**   Okay. And did you check that information right then?

15 **A**   **No, I think I asked -- he corrected himself and changed**

16     **his year of his birth, saying that -- I think '68.**

17 **Q**   Okay.

18 **A**   **And then I checked that, and there was no match in our**

19     **computer.**

20 **Q**   Okay. Do you recall asking him what his astrological sign

21     was?

22 **A**   **Yes, I do.**

23 **Q**   What's your astrological sign?

24 **A**   **I'm Libra.**

25 **Q**   I was waiting for you to say it's irrelevant, so.....

---

**112**

1     MS. WHITE: I was going to, I had the word objection.....

2     MS. KOUTCHAK: Yeah.

3     MS. WHITE: .....but then.....

4     MS. KOUTCHAK: My point exactly. Okay.

5 **Q**   And once he was confronted you stated that he dragged you

6     both about seven to 10 feet away in the alley?

7 **A**   **Correct.**

8 **Q**   Okay. And both you and Officer Cottle were there?

9 **A**   **At that time, yes.**

10 **Q**   Okay. When did Cottle show up?

11 **A**   **He was there the whole time.**

12 **Q**   Did you two contact him together?

13 **A**   **I think I contacted him first, and then, I don't know,**

14     **less than 30 seconds Officer Cottle was on scene, I**

15     **believe.**

16 **Q**   Okay. All right. One of the statements you made to the

17     prosecutor was that we didn't want to get hurt. Did you

18     get hurt?

19 **A**   **I did not.**

20 **Q**   In your opinion or to your knowledge did Officer Cottle

21     get hurt?

22 **A**   **Yes, he did.**

23 **Q**   Did you take pictures of him?

24 **A**   **No, Officer Stanfield (ph) did.**

25 **Q**   Okay. You didn't take pictures of Officer Cottle?

---

**113**

1 **A**   **Oh. No, I did not.**

2 **Q**   Okay. Describe the injuries that Officer Cottle received.

3 **A**   **I don't know.**

4 **Q**   How did you know he got hurt?

5 **A**   **Because he told me he was hurt.**

6 **Q**   Would you be surprised to hear that he just had a skinned

7     knee?

8 **A**   **No.**

9     MS. KOUTCHAK: Okay. I want -- I'm going to show you some

10     pictures that are admitted into evidence. May I approach?

11     MS. WHITE: Oh, sure. Your Honor, may I approach and look

12     at the pictures?

13     THE COURT: Yes.

14 **Q**   Do those look familiar to you? We're looking at Exhibit A

15     and Exhibit B.

16 **A**   **No.**

17 **Q**   Not at all?

18 **A**   **No, I've never seen them before.**

19 **Q**   Okay. Do you recognize the legs of the uniform?

20     THE COURT: Actually, he doesn't have personal knowledge.

21     MS. KOUTCHAK: Okay.

22     THE COURT: He said he was told, and that's it.

23     MS. KOUTCHAK: Okay.

24     THE COURT: We can move on.

25 **Q**   You didn't see anything like this, then, at the scene?

---

**114**

1 **A**   **I don't recall, no.**

2 **Q**   Okay. Officer Cottle told you that he was hurt. Do you

3     know if Officer Cottle went to the hospital for his

4     injuries?

5 **A**   **I don't know.**

6 **Q**   Okay.

7 **A**   **I don't think so, because I believe he followed me back to**

8     **the station.**

9 **Q**   Who called for the medics?

10 **A**   **I don't know.**

11 **Q**   You didn't call for the medics, did you?

12 **A**   **I don't know.**

13 **Q**   Why don't you know?

14     THE COURT: If he doesn't know, you can move on.

15     MS. KOUTCHAK: Well, if he.....

16     THE COURT: He.....

17     MS. KOUTCHAK: .....doesn't remember or if he doesn't

18     know.

19 **Q**   Did you call the medics?

20     MS. WHITE: Objection, asked and answered.

21     THE COURT: Sustained.

22 **Q**   You described the vascular restraint. You said that it's

23     also called a choke hold?

24 **A**   **No, I said some people would call it that, but that's not**

25     **quite what it is.**

---

30 (Pages 111 to 114)

Exhibit 1
Pg 11 of 17
da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

123

1  Q   Were you the one who transported Patrick Shorty to APD?
2  A   I was.
3  Q   Do you have any records at all of this?
4  A   Not with me. APD dispatch would have those records.
5  Q   APD dispatch would have the records?
6  A   Right. I advise on the radio what time I leave.
7  Q   Do you have your tape recorder running at all?
8  A   No.
9  Q   You didn't tape-record any of this?
10 A   No.
11 Q   So sometime after the fight medics showed up. Were you
12     there when the medics showed up?
13 A   I'm sure I was. I was there.
14 Q   Okay. Or did they show up?
15 A   I don't remember.
16 Q   You stated something to the effect that Patrick Shorty had
17     said he didn't want medical attention?
18 A   If I -- I'm remembering right, is that we canceled the
19     medics, and the only reason we would cancel the medics is
20     because the patient, whoever we originally called them
21     for, said that they didn't want the medics.
22 Q   You're not sure who called the medics. Are you sure who
23     cancelled the medics?
24 A   No, I don't know who cancelled them.
25 Q   Okay. Is it possible they were never really called

124

1      anyways?
2  A   Oh, no. If we -- if it says on the radio that we called
3      them, then somebody called them.
4  Q   I don't know that it says on the radio that you called
5      them.
6  A   Okay.
7  Q   This is the first I've heard of it here today, Officer.
8  A   Okay.
9  Q   So were the medics called or not?
10 A   Yes, they were.
11 Q   But you have no idea who did it.
12 A   No.
13     MS. KOUTCHAK: Sorry (indiscernible). You can fine me. I
14     thought that that was shut off. I'd locked the keys and
15     everything.
16 Q   You're the one who took Patrick Shorty back to APD. Do
17     you know what time you did that if this happened at about
18     5:30? Do you remember what time it was when you arrived
19     at APD2
20 A   I would say probably around 6:00 o'clock.
21 Q   Have any conversations with my client on the ride over?
22 A   I did.
23 Q   Are those tape-recorded?
24 A   No.
25 Q   Do you remember telling him that he'd better cooperate or

125

1      things were going to get worse for him?
2  A   No. I don't think that's something I would say.
3  Q   What did you talk about, then?
4  A   I told him he needed to stop -- because he was already
5      hobbled, I said that if he behaves himself we can get the
6      hobbles off of him.
7  Q   If he behaved himself you could get the hobbles off him?
8  A   Right.
9  Q   Did you tell him if he behaved himself you'd clean him up,
10     too?
11 A   I said if the -- I think I said if the opportunity
12     presents itself I'll see what I can do about doing that.
13 Q   So how did you get him into APD if he was hobbled?
14 A   I undid the hobbles. He didn't cause a problem on the
15     ride over there. He was behaving himself. He wasn't
16     kicking or spitting or doing any of the other things that
17     most people do when they're hobbled.
18 Q   Okay.
19 A   And so I took the hobbles off of him when we got there.
20 Q   He was pretty submissive, wasn't he?
21 A   Well, he was compliant.
22 Q   Officer, you stated earlier that you had a felony warrant
23     for his arrest. Is that to the best of your knowledge,
24     you had a felony warrant for his arrest and.....
25     MS. WHITE: Objection, asked and answered.

126

1  Q   .....that's why you went looking for him?
2      THE COURT: Overruled. You may answer.
3  A   That's right.
4  Q   So it's your belief that when you went to that scene to
5      interview Patrick Shorty or the person you believed to be
6      Patrick Shorty you thought there was a felony arrest
7      warrant for him?
8  A   Correct.
9  Q   Back to APD. When you got him to APD what did you do with
10     him?
11 A   Walked him into the interview room, sat him down.
12 Q   And how far is the interview room from the car? How many
13     feet, approximately?
14 A   I don't exactly remember where I parked, but maybe 50 feet
15     to the door, and then once inside the door maybe another
16     50 feet to the interview room.
17 Q   Okay. And once he was in the interview room what did you
18     do?
19 A   Closed the door and waited for Detective McCoy.
20 Q   And where was Detective McCoy?
21 A   I don't know if he was there already. I don't remember.
22 Q   How long do you think you waited for Detective McCoy?
23 A   I don't know. I don't remember.
24 Q   Would it surprise you if I said you maybe waited an hour?
25 A   Yeah, that would surprise me.

TRANSCRIPTS ONLY
(907) 276-0306

da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY                                    EVIDENTIARY HEARING
CASE NO. 3AN-03-7796 CR              APRIL 16, JUNE 28 & JUNE 29, 2004

---

**127**

1  Q  What kind of a room was it that you put my client into?
2  A  It's an interview room.
3  Q  Was the door locked?
4  A  No.
5  Q  He couldn't have left, though, could he have?
6  A  Well, he was handcuffed.
7  Q  Anyone else go in to see him during this time period that
8     you know of?
9  A  I don't think so. I was.....
10 Q  What did you do.....
11 A  .....standing right there.
12 Q  .....during this time period?
13 A  Waited in the hall for the detectives.
14 Q  Did you go get washed or anything?
15 A  No. He's in my custody and waiting right there with him.
16 Q  Okay. But you weren't in the room with him, right?
17 A  No.
18 Q  Any idea when Detective McCoy might have showed up/
19 A  I don't know.
20 Q  How late was your shift that night?
21 A  It went until 1:00 o'clock in the morning.
22 Q  Okay. So do you think it was nearing the end of your
23     shift?
24 A  No, I don't think so.
25 Q  Think it might have been around 8:00 o'clock at night?

---

**128**

1  A  I don't know.
2  Q  Did you do any paperwork or anything while you were
3     waiting?
4  A  I may have.
5  Q  But you don't remember.
6  A  No.
7  Q  Do you remember Detective McCoy coming?
8  A  I remember telling him -- talking to him when he got
9     there.
10 Q  Okay. And what did Detective McCoy do?
11 A  Went into the room and began to talk to him.
12 Q  And do you have any idea how long that lasted?
13 A  I don't think it lasted more than a half hour.
14 Q  Okay. Did you watch any of this interview take place?
15 A  No, I did not.
16 Q  And when it was over what happened?
17 A  I transported him Shorty -- out him back in the car and
18     transported him for a bail hearing.
19 Q  How long was it after Detective McCoy left before you
20     transported Patrick Shorty?
21 A  I don't know that he did leave, I guess. I -- I guess I
22     don't understand.
23 Q  Okay. After Detective McCoy was finished interviewing my
24     client.....
25 A  Uh-huh.

---

**129**

1  Q  .....how long was it between that time and when you
2     transported my client?
3  A  Maybe 10 minutes. I don't know.
4  Q  Again, do you have any written record?
5  A  Yeah, I think I do. Says that he was booked into the jail
6     by 8:10.
7  Q  Okay.
8  A  So if we -- so between the time of 5:27 and 8:10 all this
9     took place.
10 Q  Okay. So after the interrogation you got Patrick Shorty
11    cleaned up, then, at the police station?
12 A  No.
13    MS. WHITE: Objection, that's a mischaracterization. It's
14 not an interrogation.
15    THE COURT: Overruled. You may proceed.
16 Q  Did you.....
17    THE COURT: He said no.
18 Q  .....clean him up afterwards?
19 A  No.
20 Q  Did anyone else clean him up afterwards?
21 A  At the jail, I believe so.
22 Q  Did you ask him then if he wanted medical attention?
23 A  When?
24 Q  When he was at APD in your charge.
25 A  No.

---

**130**

1  Q  So you took him from APD still in his soiled clothes and
2     you put him where, in the back of your car again?
3  A  That's right.
4  Q  Did you put any plastic down on the seats or anything?
5  A  No.
6  Q  Okay. And you transported him where?
7  A  To a bail hearing before the magistrate.
8  Q  Okay. Here at the courthouse?
9  A  At the old courthouse, yes, ma'am.
10 Q  The old courthouse. From Tudor Road over to the old
11    courthouse. Okay. How long did you wait there for the
12    magistrate?
13 A  Not very long. I think we called ahead and let him know
14    we were going to have to do a curbside bail hearing.
15 Q  Okay. And then after that did you take him in to see the
16    magistrate?
17 A  No, that's -- what a curbside bail hearing is is the
18    magistrate comes outside to do it.
19 Q  Okay, and why was that?
20 A  Probably because his clothes were soiled and that we had
21    to fight with him.
22 Q  Okay. So for nearly three hours Mr. Shorty's been in the
23    soiled clothes, from 5:30 to approximately 8:30?
24 A  Well, until 8:10, yeah.
25 Q  Okay. And you took him where, then?

---

34 (Pages 127 to 130)

Exhibit 1
Pg 13 of 17

da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2OO4

---

**131**

1  A  To the jail.

2  Q  And did you see that he was cleaned up then?

3  A  No, I left.

4  Q  Have you ever had a situation like that before where

5     you've had a person that you arrested that had defecated

6     upon themselves and you had to bring them in for an

7     interview?

8  A  No.

9  Q  Ever had one since?

10 A  No.

11 Q  Do you have any idea what the standard procedure would be

12    in dealing with a situation like that as far as hygiene or

13    medical problems?

14 A  Well, there was a couple of different factors that went

15    into this one. One, the pants that he was wearing were

16    like military style, BDU pants, the kinds that are tied at

17    the bottoms around the ankles?

18 Q  Uh-huh.

19 A  And it wasn't possible due to the fact that I'd just got

20    done fighting with him very violently for quite awhile

21    that I felt comfortable going down and untying and putting

22    my head and my body down by his ankles to untie this rope

23    to get his pants open so that this poop could fall out.

24    That's not something I felt comfortable doing. When I got

25    him to the police station this is where all our sworn

---

**132**

1     person-- personnel, myself included, and nonsworn

2     civilians, the facilities are set up for them to shower.

3     We don't have a facility that's a secure facility for them

4     to do this in, where we can take them out of handcuffs,

5     let him undress, let him do it. That's -- we don't have a

6     facility for that other than the jail.

7  Q  But a medical facility would have also been a place to

8     have taken him to do that, wouldn't it, Officer?

9  A  No. It's not a lock-down facility.

10 Q  You're a young, relatively inexperienced officer, are you

11    not?

12 A  No, ma'am.

13 Q  You don't consider yourself a rookie at three years?

14 A  No.

15 Q  Familiar with all the department policies and procedures?

16 A  Most of them.

17 Q  And it is a policy and procedure to contact the medics

18    when you apply vascular restraint and somebody loses

19    consciousness, is it not?

20 A  I believe so.

21 Q  And the reason being because people could die in this

22    situation?

23 A  Yes.

24 Q  Serious medical injuries can be a result of having your

25    blood cut off to your head and your lungs and your heart?

---

**133**

1     That's true, isn't it, Officer?

2  A  I -- yes, I've already answered that.

3  Q  Okay.

4  A  Yes.

5  Q  But in this case you can't remember at all who called the

6     medics?

7     MS. WHITE: Objection, asked and answered.

8     THE COURT: Sustained.

9     MS. KOUTCHAK: Nothing further. Thank you.

10    THE COURT: Mr. Murtagh, did you have any questions?

11    MR. MURTAGH: I don't think I've got any (indiscernible).

12    THE COURT: Thank you.

13        OFFICER GREGORY WITTE

14 testified as follows on:

15        REDIRECT EXAMINATION

16 BY MS. WHITE:

17 Q  Officer Witte, what is the policy for cancelling medics;

18    when would medics be cancelled?

19 A  You can't force treatment on somebody. If they don't want

20    to be treated, then they don't get treated.

21 Q  And were there any signs that the defendant was going to

22    die or that he was in serious physical or medical

23    distress?

24 A  No.

25 Q  Okay. And you mentioned that your contact with the

---

**134**

1     defendant was not taped, and why was that?

2  A  It was -- you know, it's a sighting of him. We'd had two

3     prior sightings that ended up not being him. One was --

4     poor guy -- was a village public safety officer that was

5     staying at a hotel. Somebody thought that was him, and we

6     went in and, unfortunately, contacted him, surprised him

7     as all get out, and it was not him. This was getting to

8     be a regular -- a regular thing, go and contact this

9     person, somebody thinks it's Shorty.

10 Q  Okay. So how often do you actually pull out your tape

11    recorder and record contact with people?

12 A  When I do interviews with somebody for -- at a crime

13    scene, and if -- my personal thing is if I think that I

14    might not make it through it, then I run my tape.

15 Q  Okay. And did you have any reason to think that you

16    needed to run tape in this case?

17 A  I didn't have time, but, no, I did not.

18 Q  Okay. And. Are there facilities at APD where the defendant

19    could have cleaned up?

20 A  No.

21 Q  Okay, and why not?

22 A  Because those are facilities designed for the personnel of

23    the Anchorage Police Department.

24 Q  Okay. And what concerns did you have about taking the

25    handcuffs off of the defendant or letting him go into one

---

35 (Pages 131 to 134)

**Exhibit 1**

**Pg 14 of 17**

da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY
CASE NO. 3AN-03-7796 CR

EVIDENTIARY HEARING
APRIL 16, JUNE 28 & JUNE 29, 2004

---

**135**

1  of those showers that are used for APD personnel?
2  A    He -- he fought long and hard, and we fought hard to put
3       him in handcuffs, and it was not at all appropriate for us
4       to take the handcuffs off of him.
5  Q    Okay, and while you were waiting for Detective McCoy to
6       arrive where were you in relation to the defendant?
7  A    He's in the -- the room. I'm about six feet away outside
8       the door. It's -- there's only one door going into the
9       room.
10 Q    Okay, so you were standing outside that door?
11 A    That's right.
12 Q    And did the -- at APD did the defendant give you any
13      indication that he needed medical help?
14 A    No.
15      MS. WHITE: Okay. All right, thank you. I have no
16 further questions.
17      THE COURT: Anything further?
18      MS. KOUTCHAK: One moment, please, Your Honor. Your
19 Honor, I don't have my complete file here, but I don't believe
20 that there was a -- I don't believe that there was an arrest
21 warrant for my client at the time. I believe that he was only
22 wanted for questioning, and I don't know what the Court's
23 records show, if they would confirm or deny that, but I'd like
24 to keep that point open until I can provide the Court with the
25 paperwork.

---

**136**

1      THE COURT: Okay. You may step down.
2  A    Thank you.
3      (Witness excused)
4      THE COURT: Other witnesses to call?
5      MS. WHITE: Yes, Your Honor, the State calls Detective
6 McCoy.
7      THE COURT: Okay. You need to be sworn by Madam Clerk,
8 please.
9      (Oath administered)
10     DETECTIVE McCOY: I do.
11     THE CLERK: Please be seated.
12           DETECTIVE KENNETH McCOY
13 called as a witness on behalf of the plaintiff, testified as
14 follows on:
15           DIRECT EXAMINATION
16     THE CLERK: For the record, could you please state your
17 full name, spelling your last?
18 A    Sure. Kenneth McCoy, M-c-c-o-y.
19     THE CLERK: Thank you.
20     THE COURT: You may inquire.
21     MS. WHITE: Thank you, Your Honor.
22 BY MS. WHITE:
23 Q    Detective McCoy, how long have you worked for APD?
24 A    For about 9-1/2 years.
25 Q    Okay, and how long have you been a detective with the

---

**137**

1  special assaults unit?
2  A    I've been a detective for about 4-1/2 years, and I've been
3       in that particular unit for about two -- two years or so.
4  Q    And which unit were you in before special assaults?
5  A    Before that unit I was in the theft unit.
6  Q    Okay. And so last July you were in the same position that
7       you have now.
8  A    Yes.
9  Q    Okay. And did you come into contact with the defendant
10      Patrick Shorty on July 26th of last year?
11 A    Yes, I did.
12 Q    And how did that contact come about?
13 A    At about 5:40 p.m. I received a telephone call from our
14      APD dispatch center, and they informed me that Mr. Shorty
15      was in custody.
16 Q    Okay. And when did you first see Mr. Shorty?
17 A    When I arrived at the Anchorage police station.
18 Q    Okay, and what time was that?
19 A    I'm not exactly sure of my exact time of arrival. Like I
20      said, I got called at 5:40, and I know my interview with
21      him began at 6:20, so somewhere in between 5:40 and 6:20
22      p.m. I had my first contact with him.
23 Q    And do you know how long the defendant waited at APD for
24      you?
25 A    I don't know how long, no.

---

**138**

1  Q    Okay. All right. And what happened when you started the
2       interview of the defendant?
3  A    I advised him of the Miranda warning.
4  Q    And how did he respond to that advisal?
5  A    He told me he would cooperate.
6  Q    And how long did the interview last?
7  A    About 25 minutes.
8  Q    Okay. And was -- did you -- were you operating under the
9       impression that the defendant intended to cooperate with
10      you?
11 A    Yes.
12 Q    And how do you know that?
13 A    Because he told me.
14 Q    Okay. He told you that he would cooperate?
15 A    Yes.
16 Q    Okay. And when did the defendant express concerns to you
17      about his personal hygiene?
18 A    After I finished my interview with him I told him I would
19      look into the -- the possibility of getting him cleaned
20      up, and he told me at that point that he was tired of
21      smelling it. That was the first time he had mentioned his
22      hygiene.
23 Q    And what measures did you take to make sure that he would
24      get cleaned up more quickly than he might otherwise?
25 A    Well, I had to take a number of things into account as far

---

36 (Pages 135 to 138)

STATE v. SHORTY                                              EVIDENTIARY HEARING
CASE NO. 3AN-03-7796 CR                          APRIL 16, JUNE 28 & JUNE 29, 2004

---

139

1  as getting him cleaned up, things such as our police
2  department not having a secure facility to allow him to
3  undress and to shower and so forth, those facilities being
4  designated for our personnel at the police station. So
5  seeing that, I for-- forwent some of the normal procedures
6  I normally go through when I process someone for this type
7  of crime.
8        Normally at the police station I would
9  finger-- fingerprint the person, I would have the person
10  photographed at the police station, I would conduct a bail
11  hearing from the police station. I would also collect
12  sexual assault evidence from the person while at the
13  police station such as a DNA sample and other samples
14  associated with sexual assault protocol kit. That's what
15  I normally do, but in -- under these circumstances I
16  didn't do those things. I tried to get him to a bail
17  hearing as quickly as possible and then on to jail, and
18  then I went back to the jail later to collect the DNA, so
19  I didn't go through all of those other procedures just for
20  that fact.
21  Q    And it's because the facilities where he could get cleaned
22       up would.....
23  A    Right, so he could.....
24  Q    .....have been at the jail.
25  A    .....get cleaned up.....

---

140

1  Q    Okay.
2  A    .....at the jail.
3  Q    And were you present when the victim B.A. did a show-up or
4       a viewing of either one of the defendants in this case?
5  A    No, I was not.
6        MS. WHITE: Okay. Thank you. I have no further
7  questions.
8        THE COURT: Cross-examination.
9        MS. KOUTCHAK: Thank you.
10             DETECTIVE KENNETH McCOY
11  testified as follows on:
12             CROSS-EXAMINATION
13  BY MS. KOUTCHAK:
14  Q    Detective McCoy, you've been with the force for 9-1/2
15       years now?
16  A    Yes, ma'am.
17  Q    And what's your educational background?
18  A    I have a bachelor's degree.
19  Q    In what?
20  A    Justice.
21  Q    And where did you get that at?
22  A    University of Alaska.
23  Q    Were you ever in the military?
24  A    Yes, I was.
25  Q    What did you do in the military?

---

141

1  A    I was an armor officer.
2  Q    And where were you stationed at?
3  A    I was assigned with the Alaska Army National Guard here at
4       Fort Richardson, Alaska.
5  Q    Okay. What time was it that you arrived at APD?
6  A    I'm not sure of my exact arrival time.
7  Q    Okay. Any idea?
8  A    I received a phone call at 5:40 from police dispatch
9       informing me that Mr. Shorty was in custody, and I began
10       my interview at 6:20, so within -- between that 40-minute
11       time frame I arrived.
12  Q    How do you know that you stared your interview at 6:20?
13  A    Because I noted the time on the recording.
14  Q    Okay. And there's a tape-recording of this, isn't there?
15  A    Yes, ma'am.
16  Q    And there's a video recording, isn't there?
17  A    Yes, ma'am.
18  Q    Have you seen the video recording of my client?
19  A    Yes, I have.
20  Q    Did you see it from beginning to end?
21  A    Yes.
22  Q    Watch the whole thing?
23  A    Yes.
24  Q    And it's marked with a time stamp, isn't it?
25  A    I believe so.

---

142

1  Q    Okay. Do you know how long it was he sat there, then?
2  A    I don't.
3  Q    You don't remember that?
4  A    I don't. I know my interview lasted about 25 minutes. I
5       don't know the entire duration, though.
6  Q    Okay. But you have seen the tape that shows when he's
7       brought in and when he's taken out of that room.
8  A    The tape begins when I start the tape when I arrived at
9       the police station. I got a videotape and I got that
10       started, so that's the beginning of the tape is when
11       I.....
12  Q    When you yourself.....
13  A    .....placed it in the recorder.
14  Q    .....started it?
15  A    Yes.
16  Q    And we're talking about the videotape.
17  A    The videotape, yes.
18  Q    Okay. And who stopped it?
19  A    I believe I did.
20  Q    Okay. Do you recall watching my client pull something out
21       of his pocket and eat it?
22  A    And eat it?
23  Q    Uh-huh.
24  A    No, I don't recall that.
25  Q    Never saw that on the tape?

---

                                               37 (Pages 139 to 142)

Exhibit 1
Pg 16 of 17
da7bd505-06f0-4167-9e3a-d5649dd0ff84

STATE v. SHORTY                                    EVIDENTIARY HEARING
CASE NO. 3AN-03-7796 CR                   APRIL 16, JUNE 28 & JUNE 29, 2004

---

151

EVIDENTIARY HEARING, CONTINUED
BEFORE THE HONORABLE MICHAEL L. WOLVERTON
Superior Court Judge

Anchorage, Alaska
June 29, 2004
2:57 o'clock p.m.

APPEARANCES:

FOR THE PLAINTIFF:    DEPARTMENT OF LAW
                     DISTRICT ATTORNEY'S OFFICE
                     BY: ERIN E. WHITE, ESQ.
                     ASSISTANT DISTRICT ATTORNEY
                     310 K Street, Suite 520
                     Anchorage, Alaska 99501
FOR THE DEFENDANT    JOHN M. MURTAGH, ESQ.
THOMAS LEICHTY:      1101 West Seventh Avenue
                     Anchorage, Alaska 99501
FOR THE DEFENDANT    LAW OFFICE OF ROBIN KOUTCHAK
PATRICK SHORTY:      BY: ROBIN L. KOUTCHAK, ESQ.
                     814 West Second Avenue
                     Anchorage, Alaska 99501

TRANSCRIPTS ONLY
(907) 276-0306        151

---

152

1         P R O C E E D I N G S
2    3AN-5304-132
3    2:57:18
4         THE COURT: You may be seated. We're back on record.
5    This is the continuation of a motion hearing in 3ANS-03-7048,
6    State of Alaska v. Thomas Leichty, he's here with counsel,
7    Mr. Murtagh, and 03-7796, State of Alaska v. Patrick Shorty, who
8    is here with counsel. Ms. Koutchak and Ms. White's here.
9         I've reviewed the videotape, and I guess I would note that
10   I -- I wanted to make sure that this was clear. In your
11   opposition to the motion to suppress, Ms. White, at page 2, last
12   few paragraph, you said at the end of the interview, which lasts
13   approximately 25 minutes, Detective McCoy told the defendant
14   that he would see if they could get him cleaned up. At that
15   point the defendant stated he was, quote, tired of smelling the
16   stuff, close quote, and that was the first time during the
17   interview that the defendant had complained about his personal
18   hygiene situation. The tape actually makes very clear that
19   Officer Witte had talked to him about that twice, and I think
20   the first thing that Mr. -- Detective McCoy said before the
21   transcript starts is -- you got comment on that?
22        MS. WHITE: Yes, Your Honor. I would agree with that. I
23   reviewed the videotape today. Before when I wrote this I was
24   relying on the transcript.
25        THE COURT: And I kind of assumed that's what happened. I

---

153

1    guess given that, what is your position with respect to the
2    defense position about the.....
3         MS. WHITE: Your Honor, our position has not changed in
4    this case. We had to get the interview done and the defendant
5    was taken as quickly as possible to get showered and cleaned up.
6    He was not complaining about being overly uncomfortable, and you
7    sat rather still for most of the interview. It wasn't like
8    he -- Detective McCoy talked to him and read him his rights. He
9    knew that he did not have to talk to Detective McCoy. He said
10   that he wanted to cooperate with Detective McCoy. He didn't say
11   -- Detective McCoy had told him that we're going to make sure
12   that you get cleaned up, and the defendant did not say anything
13   along the lines of I'm so uncomfortable, I can't talk to you
14   now, I want to get cleaned up before we talk. The defendant was
15   willing to talk to the defective, and even though he was given
16   an opportunity to say, no, I don't want to talk, the defendant
17   chose to go ahead and talk, and he did not express any
18   outrageous discomfort, given his situation.
19        THE COURT: I guess my view is -- and I'm thinking about
20   the Beavers case, and I think about what -- well, even the
21   dissent in Beavers said, you know, they thought it was a fairly
22   minimal pressure that was placed -- or whatever, you know, you
23   want to call it -- with Mr. Beavers by saying you're going to
24   get hammered -- and that was the phrase that was used -- if you
25   don't come clean with us, and comparing that to the circumstance

---

154

1    where -- I mean, I think it was commendable on the one hand of
2    Officer Witte, who's -- who was inquiring and he even discusses
3    with somebody kind of out in the doorway, you know, if there's a
4    possibility of getting him showered there before they continue
5    or, you know, how that could be possibly done, and he asks him a
6    couple of times, and it was the first thing that Detective McCoy
7    said.
8         And, you know, in Beavers, I'm quoting, they say among
9    circumstances -- among the circumstances relevant to the court's
10   determination of voluntariness are the age, mentality and prior
11   criminal experience of the accused, the length and intensity and
12   frequency of interrogation -- and I'm focusing on this part --
13   the existence of physical deprivation or mistreatment. And the
14   comments were, well, after we get done talking we -- we'll try
15   to get you cleaned up, and I find that -- I understand under the
16   circumstances that what -- he was trying to arrange to get
17   Mr. Shorty cleaned up, and I don't think it was on the behalf of
18   Detective McCoy or Officer Witte sort of malevolent or anything
19   like that. I do think it does sort of shock the conscience --
20   shocks my conscience to say, well, we're going to talk to you
21   now, and then beyond that he sat there for something like 34
22   minutes after the interview in his own excrement, so I'm going
23   to grant the motion to suppress.
24        With that, Mr. Murtagh.....
25        MR. MURTAGH: Yes, Your Honor.

---

TRANSCRIPTS ONLY
(907) 276-0306

Exhibit 1
Pg 17 of 17

da7bd505-06f0-4167-9e3a-d5649dd0ff84